UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

IN RE:
WESTPORT HOLDINGS TAMPA, LP,

      Debtor.
_____/

CPIF LENDING, LLC,

      Creditor/Appellant,
v.                    Case No. 8:18-cv-1221-T-33
                             Bankr. No. 8:16-bk-8167

WESTPORT HOLDINGS TAMPA, LP,
WESTPORT HOLDINGS TAMPA II, LP,
OFFICIAL COMMITTEE OF RESIDENT
CREDITORS, and JEFFREY WARREN,

      Debtors/Appellees.
_____/

**ORDER**

In the context of a Chapter 11 bankruptcy proceeding, Appellant CPIF Lending, LLC appeals the Bankruptcy Court's order confirming a joint plan of liquidation and order valuing CPIF's collateral. The appeal is fully briefed and, as discussed below, the Court affirms both orders.

**I.   Background**

University Village is a continuing care retirement community located in Tampa, Florida. (Doc. # 7 at 9). University Village is comprised of independent living

1

apartments and villas (Independent Living Facility) and an assisted living and skilled nursing facility (Health Center). (Doc. # 11 at 7). Independent Living Facility is owned by Westport Holdings Tampa, LP (Westport I) and Westport Holdings Tampa II, LP (collectively, Debtors), both of which are debtors in the underlying bankruptcy proceeding. (Doc. # 7 at 9). Health Center is owned by Westport Nursing Tampa, LLC, which is not a debtor in the underlying bankruptcy proceeding. (Id.). A full history of these entities' corporate structure is unnecessary, but suffice it to say that Westport Nursing used to be a wholly-owned subsidiary of Westport I. (Doc. # 11 at 8). Westport I's transfer of its ownership interest in Westport Nursing – and thus, Health Center – eventually led to proceedings by the Florida Department of Financial Services. (Id.).

On September 22, 2016, Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. (Id.). Shortly thereafter, the United States Trustee appointed the Official Committee of Resident Creditors (Resident Committee) to represent the interests of Independent Living Facility's residents. (Id. at 9). CPIF, one of Debtors' creditors, filed a secured claim in the amount of $9,781,224.58 based on a

2

$9.5 million loan from CPIF in favor Debtors. (<u>Id.</u> at 10). The loan was secured by a lien on all of Debtors' assets, including Independent Living Facility and any cash collateral generated by Independent Living Facility. (Doc. # 7 at 11). CPIF's secured claim was subject to objections and an adversary proceeding, which remained pending before the Bankruptcy Court when this appeal was filed. (Doc. # 11 at 10). Throughout the bankruptcy proceedings, the Bankruptcy Court entered numerous orders permitting Debtors' use of cash collateral. The cash collateral orders provided that CPIF's "cash collateral," as "defined in Section 363(a) of the Bankruptcy Code," would receive adequate protection against any diminution in value. <u>See</u> (Doc. ## 3-7 to 3-20, 3-23, 3-42, 3-45, 3-49, 3-57, 3-80).

On January 18, 2018, the Bankruptcy Court approved a settlement agreement reached between Debtors, Westport Nursing, the Resident Committee, and others to transfer Westport Nursing's ownership interests back to Westport I, thereby reunifying the ownership of University Village. (Doc. # 11 at 9). That same day, Debtors and the Resident Committee submitted a Chapter 11 plan to the Bankruptcy Court. (<u>Id.</u>). Among other things, the plan called for the sale of the

unified University Village – comprised of both Independent Living Facility and Health Center. (Id. at 9-10). CPIF objected to the plan and opposed confirmation on numerous grounds. (Doc. # 7 at 10). As a result, the plan's proponents pursued confirmation under 11 U.S.C. § 1129(b) – commonly known as the "cramdown" provision. (Doc. # 11 at 13).

The Bankruptcy Court held a three-day trial on confirmation of the plan. (Id.). To challenge the plan's feasibility and other confirmation requirements, CPIF presented an expert witness, Ed Smith, who testified the value of Independent Living Facility was $12.9 million as of February 6, 2018. (Doc. # 7 at 15). Smith also testified the value of Independent Living Facility was $16.9 million as of September 22, 2016 – the petition date. (Id. at 15-16). Smith's testimony was relied upon by two other experts who testified on the plan's feasibility, the "best interest of the creditors" test, and an appropriate interest rate. (Id. at 16).

Following this testimony, Debtors orally moved to establish the value of Independent Living Facility and CPIF's secured claim at $12.9 million. (Id. at 17). CPIF objected, arguing the value of Independent Living Facility and CPIF's

secured claim should be based on the actual amount Independent Living Facility is sold for in a fair market sale. (<u>Id.</u>). The Bankruptcy Court accepted Smith's valuation and held that for purposes of the confirmation hearing, the value of Independent Living Facility was $12.9 million. (Doc. # 3-70 at 147).

The Bankruptcy Court explained in its oral confirmation ruling that while Debtors had a few interested potential buyers, no actual buyer existed yet. (Doc. # 3-71 at 14:19-15:5). The Bankruptcy Court also noted the sales process was hindered by a few issues, including returning Health Center back to Westport I. (<u>Id.</u> at 15:7-21). Nonetheless, the Bankruptcy Court concluded the plan was fair and equitable, explaining:

> To be fair and equitable, the plan must provide that CPIF[]'s lien attaches to the University Village's sale proceeds and that CPIF[] will receive, on account of its lien, payments totaling the allowed amount of such claim as of the effective date of the plan. To determine whether the Debtors' plan satisfies that requirement, the Court must first determine the amount of CPIF's secured claim. Significantly, the Debtors and the [Resident] Committee have objected to CPIF[]'s claim. There's an adversary proceeding dealing with that claim that is pending. So as of confirmation, CPIF[] does not have an allowed secured claim. Putting that aside, the Court determined that the value of CPIF[]'s collateral, the Independent Living

Facility, was $12.9 million. So the maximum amount
of CPIF[]'s secured claim is $12.9 million.

(Id. at 19:18-20:11).

As modified by the Bankruptcy Court, the confirmed plan
provides for the creation of a liquidating trust to pursue
the sale of the unified University Village. (Doc. # 3-78 at
35-36). Any sale of University Village by the liquidating
trustee is subject to approval under 11 U.S.C. § 363 and
CPIF's ability to object. (Id.).

How and when CPIF's secured claim will be paid depends
on when University Village is sold. If University Village is
sold within six months of the plan's effective date, CPIF's
lien will attach to the proceeds of the sale. (Id. at 26-27).
Alternatively, if University Village is sold beyond that
date, CPIF's lien will also attach to the proceeds of the
sale, but only if the buyer does not assume the obligation to
repay CPIF. (Id.). If the buyer assumes the obligation,
University Village will be sold subject to CPIF's liens, and
CPIF will be paid through deferred cash payments over ten
years with an interest rate of 5.84%. (Id.). Also, after the
six-month period, and until University Village is sold, CPIF
will be paid through deferred cash payments over ten years

with an interest rate of 5.84% by the liquidating trustee. (Id.).

If CPIF is to be paid from the cash sale proceeds, the plan requires a reserve be established in favor of CPIF equal to $12.9 million, less outstanding taxes. (Id.). The reserve must be funded before the liquidating trustee can use the cash sale proceeds to pay any allowed claims junior to CPIF's allowed secured claim. (Id.). If the sale of University Village generates proceeds in excess of $12.9 million, the excess proceeds may be used to pay junior credits. (Id.).

On May 8, 2018, the Bankruptcy Court entered its valuation order, which reiterated that Independent Living Facility's value is $12.9 million for confirmation purposes and the maximum amount of CPIF's secured claim is $12.9 million, less outstanding taxes. (Doc. # 3-2). On May 10, 2018, the Bankruptcy Court entered its confirmation order, which overruled CPIF's objections and granted the plan proponents' cramdown request. (Doc. # 3-3). This appeal followed.

## II. __Standard of Review__

Upon entry of a final order by the Bankruptcy Court, a party may appeal to the District Court pursuant to 28 U.S.C.

§ 158(a). The United States District Court functions as an appellate court in reviewing decisions of the United States Bankruptcy Court. In re Colortex Indus., Inc., 19 F.3d 1371, 1374 (11th Cir. 1994). This Court reviews de novo the legal conclusions of the Bankruptcy Court. In re JLJ, Inc., 988 F.2d 1112, 1116 (11th Cir. 1993).

The standard of review employed by this Court in reviewing the Bankruptcy Court's findings of fact is the clearly erroneous standard of review described in Federal Rule of Bankruptcy Procedure 8013: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." See In re Thomas, 883 F.2d 991, 994 (11th Cir. 1989). A finding of fact is clearly erroneous when, "although there is evidence to support it, the reviewing court on the entire record is left with the definite and firm conviction that a mistake has been committed." Crawford v. W. Elec. Co., Inc., 745 F.2d 1373, 1378 (11th Cir. 1984) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)).

## III. **Analysis**

A Chapter 11 plan may be confirmed only if each class of creditors affected by the plan consents. 11 U.S.C. § 1129(a). However, there is an exception under 11 U.S.C. § 1129(b). Section 1129(b) permits confirmation of a nonconsensual plan — known as a cramdown plan — "if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b).

Under Section 1129(b)(2)(A), a cramdown plan is "fair and equitable" with respect to secured creditors if the plan provides for one of the following:

> (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property;
>
> (ii) for the sale, subject to [11 U.S.C. § 363(k)], of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this subparagraph; or

> (iii) for the realization by such holders of the
> indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2)(A). Relevant to this appeal is clause (ii) – "the rule for plans under which the property is sold free and clear of the creditor's lien." RadLAX Gateway Hotel, LLC v. Amalgamated Bank, 566 U.S. 639, 647 (2012).

Under Section 1129(b)(2)(A)(ii), the collateral is sold free and clear of the lien, subject to 11 U.S.C. § 363(k), and the creditor receives a lien on the sale proceeds. 11 U.S.C. § 1129(b)(2)(A)(ii); RadLAX, 566 U.S. at 644. The lien must then be treated under clause (i) or (iii) – meaning the creditor must either receive deferred cash payments of at least the full value of its claim or receive the "indubitable equivalent" of its claim. See 11 U.S.C. § 1129(b)(2)(A)(ii).

CPIF argues the Bankruptcy Court erred in determining the plan is fair and equitable. Specifically, CPIF contends the plan is not fair and equitable because: (1) CPIF's interest in its collateral is capped based on a judicial valuation, even though the plan calls for the sale of the collateral; (2) junior creditors and administrative claimants will be paid before CPIF realizes the full value of its claim; (3) payment of CPIF's diminution in value liens are not

provided for in the plan; and (4) CPIF's right to credit-bid at the sale of its collateral is not fully protected. (Doc. # 7).

## A. **Valuation of Independent Living Facility**

CPIF argues the plan is not fair and equitable because the Bankruptcy Court applied the wrong valuation standard. (Id. at 18). Valuation is a mixed question of law and fact. In re Seaside Eng'g & Surveying, 780 F.3d 1070, 1075 (11th Cir. 2015). "Selection of a valuation method is a legal matter subject to de novo review, and findings made under that standard are facts subject to clear error review." Id. According to CPIF, plans confirmed under Section 1129(b)(2)(A) require different valuation standards depending on whether the plans are confirmed under clause (i) or (ii). (Doc. # 7 at 18-20). Specifically, CPIF contends that "[j]udicial determination of value is only appropriate under the terms of [Section 1129(b)(2)(A)(i)] where the debtor will keep the collateral," but "judicial valuation is inappropriate and violates the fair and equitable requirement as provided under [S]ection 1129(b)(2)(A)(ii)." (Id.).

Contrary to CPIF's assertion, Section 1129(b)(2)(A) does not mandate a particular method of valuation. See In re

11

<u>Houston Reg'l Sports Network, LP</u>, 886 F.3d 523, 528-29 (5th Cir. 2018) ("[Section] 1129 presumes the collateral has been assigned value . . . . It does not provide any guidance as to how the initial valuation should be made."). And because "[Section 1129(b)(2)(A)(ii)] is a detailed provision that spells out the requirements for selling collateral free of liens," the Court will not re-write the statute to require a particular method of valuation. <u>RadLAX</u>, 566 U.S. at 646. In fact, the Bankruptcy Code does not require a particular method of valuation or a particular valuation date for Chapter 11 bankruptcies. <u>In re Houston</u>, 886 F.3d at 528. Therefore, "[b]ankruptcy courts possess few constraints on their choice of valuation methodology." <u>In re Diamond Beach VP, LP</u>, 551 B.R. 590, 609 (Bankr. S.D. Tex. 2016) (capitalization and bold typeface omitted). Likewise, bankruptcy courts have flexibility to select the date to value collateral in light of the purpose of the valuation and the proposed disposition of the collateral. <u>In re Houston</u>, 886 F.3d at 528.

The Bankruptcy Court valued Independent Living Facility when the plan was confirmed. Under the plan, Independent Living Facility is to be sold as part of the unified University Village – components of which are not part of the

bankruptcy estate. As noted by the Bankruptcy Court, the reunification and sale of University Village will help resolve the challenges Debtors previously faced with the property's sale. (Doc. # 3-71 at 15:19-21); see In re Seaside, 780 F.3d at 1075 ("[A]ll relevant factors to property value must be considered to arrive at a just valuation of a property." (citations omitted)). As a result, the Bankruptcy Court held Independent Living Facility's market value at the time of confirmation, rather than its future sale value, was the proper measure of CPIF's secured claim. See In re Diamond, 551 B.R. at 613 ("[T]he ultimate goal of any valuation inquiry, regardless of method, is to find fair market value.").

Despite CPIF's assertion that the Bankruptcy Court should have waited until Independent Living Facility's sale, "[t]he majority of courts . . . have held that for purposes of confirming a Chapter 11 plan of reorganization, the proper time for valuation is the date of confirmation." Deutsche Bank Nat'l Tr. Co. v. Jackson, 9:15-CV-81506-RLR, 2016 U.S. Dist. LEXIS 132476, at *8 (S.D. Fla. Sept. 27, 2016). Indeed, before confirming the plan, the Bankruptcy Court was required to determine the value of CPIF's collateral. See In re

Williams, 850 F.2d 250, 253 (10th Cir. 1988) (holding pursuant to its "mandatory independent duty" to determine whether the plan complied with Section 1129(b), bankruptcy court properly considered the value of the collateral). Without ascertaining the value of CPIF's collateral, the Bankruptcy Court would have been unable to determine whether the plan was fair and equitable. See In re King Res. Co., 651 F.2d 1326, 1339 (10th Cir. 1980) ("[A]ny determination that a plan is fair and equitable requires a valuation of the debtor's property."); In re Exide Techs., 303 B.R. 48, 60-61 (Bankr. D. Del. 2003) ("A determination of the Debtor's value directly impacts the issues of whether the proposed plan is 'fair and equitable,' as required by 11 U.S.C. § 1129(b).").

Accordingly, the Bankruptcy Court was not required to wait until the sale of Independent Living Facility to determine the value of CPIF's secured claim. Cf. In re Sandy Ridge Dev. Corp., 881 F.2d 1346, 1354 (5th Cir. 1989) (holding bankruptcy court was not required to wait until the sale of the collateral to set its value); In re Atlanta S. Bus. Park, Ltd., 173 B.R. 444, 450 (Bankr. N.D. Ga. 1994) (rejecting secured creditor's "argument that value is to be determined at some future date when it disposes of the property").

14

CPIF argues "[t]he sale itself is the appropriate indicator of value for purposes of allowing CPIF's secured claim." (Doc. # 7 at 28). However, Section 506(a) states a secured claim's value is "determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest." 11 U.S.C. § 506(a)(1). Section 506(a) therefore "contemplate[s] that [the valuation] determination is to be made by the court." In re Sandy Ridge, 881 F.2d at 1354; see also In re Houston, 886 F.3d at 529 (noting initial valuation for purposes of Section 1129 is made under Section 506); In re Heritage Highgate, Inc., 679 F.3d 132, 142 n.8 (3rd Cir. 2012) (noting the Federal Rules of Bankruptcy Procedure "necessarily require[] that collateral's worth be affixed in advance of a reorganization's completion").

Thus, the Bankruptcy Court appropriately determined "the value of CPIF[]'s collateral, the Independent Living Facility, was $12.9 million[,] [s]o the maximum amount of CPIF[]'s secured claim is $12.9 million." (Doc. # 3-71 at 20:8-11); see 11 U.S.C. § 506(a) ("An allowed claim of a creditor secured by a lien on property in which the estate

has an interest . . . is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property."); United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 372 (1988) ("The phrase 'value of such creditor's interest' in § 506(a) means 'the value of the collateral.'").

CPIF further contends there is no "practical need to make a judicial determination of a secured creditor's allowed claim as of the confirmation hearing where the plan provides for the sale of that secured creditor's collateral." (Doc. # 7 at 26). However, if University Village is not sold within six months of the plan's effective date, the liquidating trustee is obligated to begin making deferred cash payments to CPIF "of the outstanding principal amount of [CPIF's] Allowed Secured Claims." (Doc. # 3-78 at 27). Without having previously determined the value of Independent Living Facility, the amount of CPIF's secured claim would have been unknown. Thus, CPIF would have been unable to receive deferred cash payments under the plan.

In sum, considering the purpose of the valuation and the proposed disposition of Independent Living Facility, the Bankruptcy Court did not err in its valuation. The Bankruptcy

Court considered how Independent Living Facility was to be sold under the plan and the purpose of the valuation. The Bankruptcy Court was well within its discretion to weigh CPIF's expert testimony and determine whether to accept or reject that testimony. See Alberts v. HCA, Inc., 496 B.R. 1, 13 (D.D.C. 2013) ("Bankruptcy judges, acting as fact finders, are free to credit or disregard portions of expert testimony without subjecting those decisions to de novo review."). Thus, the Bankruptcy Court committed no error in its valuation.

## B.     Absolute Priority Rule

Next, CPIF argues the plan is not fair and equitable because it violates the absolute priority rule. According to CPIF, the absolute priority rule is violated "because the Plan provides for the use of CPIF's collateral proceeds exceeding the Bankruptcy Court's judicial valuation of the collateral to pay junior secured creditors like the estate professionals and junior unsecured creditors before CPIF is paid in full all amounts due under the loan documents." (Doc. 7 at 23).

CPIF submitted a claim for $9,781,224.58, and the Bankruptcy Court determined the maximum amount of CPIF's

secured claim is $12.9 million. (Doc. # 3-71 at 20:6-11). This means CPIF is a secured creditor up to $12.9 million, but if Independent Living Facility is sold for less than $12.9 million, the outstanding balance of CPIF's lien will be unsecured. (Doc. # 3-78 at 30-31).

"[T]he absolute priority rule provides that a dissenting class of unsecured creditors must be provided for in full before any junior class can receive or retain any property [under a reorganization] plan." Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 202 (1988) (citations and internal quotation marks omitted). Some courts have held the absolute priority rule applies to secured creditors. See, e.g., In re Miami Ctr. Assoc., Ltd., 144 B.R. 937, 941 (Bankr. S.D. Fla. 1992) ("The debtor argues that the absolute priority rule . . . is purely a creature of statute, available only to unsecured creditors. This Court (as well as several others) disagrees." (citations omitted)). However, some courts have held the absolutely priority rule does not apply to secured creditors. See, e.g., In re New Midland Plaza Assocs., 247 B.R. 877, 895 (Bankr. S.D. Fla. 2000) ("The Court holds therefore as a matter of law that a fully secured creditor . . . does not have standing to assert the absolute priority

rule to block confirmation.").

Section 1129(b)(2)(B), which applies to unsecured creditors, incorporates the absolute priority rule, while Section 1129(b)(2)(A), which applies to secured creditors, does not. <u>See</u> 11 U.S.C. § 1129(b)(2)(B)(ii); <u>Mercury Capital Corp. v. Milford Conn. Assocs., L.P.</u>, 354 B.R. 1, 13 (D. Conn. 2006) ("The statutory language itself clearly limits Section 1129(b)(2)(B) to classes of 'unsecured claims.'"). The Court agrees that the absolute priority rule does not apply to secured creditors, such as CPIF, based on the plain language of Section 1129(b)(2). <u>See</u> <u>United States v. Creamer</u>, 195 B.R. 154, 156 (M.D. Fla. 1996) ("The absolute priority rule does not apply to second creditors covered by [Section 1129(b)(2)(A)] because it was specifically omitted from that subsection."); <u>accord</u> <u>In re TCI 2 Holdings, LLC</u>, 428 B.R. 117, 168-69 (Bankr. D.N.J. 2010) ("The structure of § 1129(b)(2)(A), (B) and (C) supports the proposition that the absolute priority rule . . . does not apply to secured claims.").

The Court further rejects CPIF's contention that the absolute priority rule is violated because estate professionals will be paid before CPIF if Independent Living

Facility is sold for less than $12.9 million. If the sale of Independent Living Facility does not generate sufficient proceeds to cover CPIF's lien, the outstanding balance of the lien will be unsecured. Administrative claims, which include those of estate professionals, receive first priority. 11 U.S.C. §§ 503(b), 507(a). Thus, the absolute priority rule is not violated by paying administrative claims before all other unsecured claims. Furthermore, some of these expenses may even take priority over secured claims. See In re Grogan, No. 11-65409-fra11, 2013 WL 4854313, at *4 (Bankr. D. Or. Sept. 10, 2013) (holding plan's provision requiring payment for cost of sale before secured creditor's lien was appropriate under Section 1129(b)(2)(A)(ii)).

Finally, it is worth noting CPIF's right to credit-bid under 11 U.S.C. § 363(k) effectively eliminates any possibility that Independent Living Facility will be sold for less than $12.9 million. A debtor may not sell its property free and clear of a creditor's lien under Section 1129(b)(2)(A)(ii) without allowing the creditor to credit-bid under Section 363(k). RadLAX, 566 U.S. at 647. Credit-bidders may bid up to the full value of their loan, which ensures the collateral will not be sold at a depressed price.

<u>Id.</u> at 644 n.2. If CPIF fears Independent Living Facility will be sold for less than $12.9 million, CPIF may credit-bid up to the amount of its loan.

In sum, the Bankruptcy Court did not err in concluding the plan satisfies the absolute priority rule.

## C. <u>Diminution in Value Liens</u>

CPIF also argues the plan is not fair and equitable because it fails to provide for the payment of the diminution in value liens granted by the Bankruptcy Court. (Doc. # 7 at 30). CPIF fails to offer any case law to support its assertion that Chapter 11 plans must provide for the payment of diminution in value liens to be fair and equitable. This diminution was granted to provide CPIF with adequate protection in case the value of its cash collateral decreased. Yet "'[a]dequate protection' is not a standard the Bankruptcy Code uses in connection with confirmation decisions." <u>Confederation Life Ins. Co. v. Beau Rivage, Ltd.</u>, 126 B.R. 632, 640 n.12 (Bankr. N.D. Ga. 1991); <u>see also</u> <u>In re Monnier Bros.</u>, 755 F.2d 1336, 1340 (8th Cir. 1985) ("The bankruptcy court's . . . order of confirmation appears to have discharged the obligation for which [the secured creditor] sought adequate protection."); <u>In re Hoffman</u>, 52 B.R. 212, 216

(Bankr. D.N.D. 1985) ("Adequate protection is neither an enumerated element under section 1129(b) nor a standard used in connection with confirmation decisions.").

Regardless, according to CPIF, because Independent Living Facility diminished in value by $4 million during the bankruptcy proceeding, CPIF contends it should receive payment for this diminution. In other words, CPIF would be entitled to the first $16.9 million in proceeds from the sale of Independent Living Facility, rather than $12.9 million. However, the Bankruptcy Court determined the value of CPIF's interest in Independent Living Facility to be $12.9 million when the plan was confirmed. Allowing CPIF to recover an additional $4 million would create an end run around this value determination.

The fact that Independent Living Facility was previously valued at $16.9 million does not mean the value of CPIF's interest should be the same for confirmation purposes. "[T]here can be several valuations in the course of a case. Thus, there could be a valuation for adequate protection purposes and also one for confirmation purposes." In re Cason, 190 B.R. 917, 925 (Bankr. N.D. Ala. 1995). Accordingly, "determinations for purposes of adequate protection [are] not

binding for purposes of 'cram down' on confirmation in a case under Chapter 11." Id. at 926 (quoting 124 Cong. Rec. H11095 (daily ed. Sept. 28, 1978), S17411 (daily ed. Oct. 6, 1978)). Permitting CPIF to receive more than its allowed secured claim would not be fair and equitable. See In re Chemtura Corp., 439 B.R. 561, 592 (Bankr. S.D.N.Y. 2010) ("[T]he 'fair and equitable' requirement encompasses a rule that a senior class cannot receive more than full compensation for its claims."); see also In re Fontainebleau Las Vegas Holdings, LLC, 434 B.R. 716, 749-50 (Bankr. S.D. Fla. 2010) ("[P]rotection is required only for the value of an entity's interest in the property. And the value of an entity's interest in the property means the value of the collateral." (citations and internal quotation marks omitted)).

Furthermore, CPIF is not entitled to the value for the diminution in value of Independent Living Facility because the Bankruptcy Court's cash collateral orders only applied to CPIF's "cash collateral," as "defined in Section 363(a) of the Bankruptcy Code." See (Doc. ## 3-7 to 3-20, 3-23, 3-42, 3-45, 3-49, 3-57, 3-80). Section 363 provides that "on request of an entity that has an interest in property . . . proposed to be used. . . [the court] shall prohibit or condition such

23

use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). When adequate protection is required under Section 363, such adequate protection may be established by providing a replacement lien in the collateral "to the extent that [the collateral's use] results in a decrease in the value of" the collateral. 11 U.S.C. § 361(2). This means the adequate protection provided for certain collateral is limited to protecting against a diminution in value in that specific collateral.

CPIF obtained adequate protection for its interest in Debtors' "cash collateral," which "means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents." 11 U.S.C. § 363(a). Yet there is nothing in the record to suggest the value of the cash collateral decreased during the bankruptcy proceeding. CPIF is not entitled to adequate protection payments for diminution in value absent a decrease in the collateral's value. Beau Rivage, 126 B.R. at 640. While CPIF's non-cash collateral — Independent Living Facility — decreased in value, the Bankruptcy Court's cash collateral orders did not provide for adequate protection of CPIF's non-cash collateral.

Accordingly, the Bankruptcy Court did not err by failing to require the plan to provide for the payment of CPIF's diminution in value liens.

### D. <u>Right to Credit-Bid</u>

Finally, even though the plan and the Bankruptcy Court's confirmation order state CPIF may credit-bid when its collateral is sold, CPIF notes "there may be objections [brought by Debtors] to CPIF's right to credit bid when a sale is ultimately brought before the Bankruptcy Court." (Doc. # 7 at 31). Therefore, "CPIF submits that no aspect of the Plan, Confirmation Order, or Collateral Valuation Order should be permitted to serve as a basis on which to object to CPIF's right to credit bid in a sale of the Independent Living Facility." (<u>Id.</u> at 32).

CPIF's argument that Debtors may object to CPIF's right to credit-bid at a future sale is not ripe for adjudication. "The ripeness doctrine protects federal courts from engaging in speculation or wasting their resources through the review of potential or abstract disputes." <u>Digital Props., Inc. v. City of Plantation</u>, 121 F.3d 586, 589 (11th Cir. 1997). Under the plan and the confirmation order, CPIF may credit-bid when its collateral is sold. Thus, CPIF's right to credit-bid is

currently protected, notwithstanding a potential future objection. The Bankruptcy Court may address Debtors' objection if and when it is made. See <u>In re Akincibasi</u>, No. 3:05-CV-365-J-32, 2005 WL 1529444, at *1 (M.D. Fla. June 27, 2005) ("[U]nless and until appellant files objections to such claim and unless and until the Bankruptcy Court issues an Order overruling all of appellant's objections, the matter appellant seeks to address is not ripe for appellate review."). Therefore, the Court does not reach CPIF's credit-bidding argument.

## IV. <u>Conclusion</u>

As outlined above, the Court concludes that the Bankruptcy Court did not err in confirming the plan, as the plan is fair and equitable under Section 1129(b). Consequently, the Bankruptcy Court's order confirming the joint plan of liquidation and order valuing CPIF's collateral are affirmed.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

The Bankruptcy Court's order confirming the joint plan of liquidation and order valuing Appellant CPIF Lending, LLC's collateral are **AFFIRMED.** The Clerk is directed to

transmit a copy of this Order to the Bankruptcy Court and thereafter close the case.

**DONE** and **ORDERED** in Chambers, in Tampa, Florida, this <u>28th</u> day of June, 2019.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE